## COUNTY OF PROVIDENCE, MARCH TERM, 1859, AT PROVIDENCE.

PRESENT:

Hon. SAMUEL AMES, Chief Justice.
Hon. GEORGE A. BRAYTON, } Justices.
Hon. ALFRED BOSWORTH, }

## TRUMAN BECKWITH v. GEORGE A. HOWARD.

In construing a covenant in a lease by indenture, the words of the covenant are to be taken, however set down in the instrument, as the words of the party to whom they properly belong, or if properly belonging to both, as the words of both; the words of an indenture being the words of either party, and not to be taken most strongly against the one or beneficially for the other, as the words of a deed-poll are.

Under this rule, where in the clause of demise in the lease, following a description of the lot leased as bounded on either side by a gangway, is thrown in this sentence, " the said gangways are to be kept open for the benefit of the lot hereby leased, and also of the lots hereunto adjoining; " held, that this was a covenant of the lessee as well as of the lessor.

A court of equity will, at the suit of a joint owner of the reversion of premises leased for a term of ninety-five years, upon final hearing, perpetually enjoin the lessee, who has purchased in four fifths of the reversion, from building upon, or over, or closing up, or encumbering, contrary to a stipulation in the lease, a private gangway laid out between,

and for the benefit of the demised premises and an estate adjoining owned by the lessee; and this, without regard to the use or value for use of the gangway, or to the comparative advantage to the plaintiff and disadvantage to the defendant, consequent upon the injunction.

BILL IN EQUITY by the plaintiff, a joint owner with the defendant of the reversion of the Howard Block estate, so called, situated on the north side of Westminster Street, Providence, to restrain the defendant, also tenant of the same under a lease for ninety-five years, from building upon and closing up a gangway at the east end of said estate, contrary to the provisions of the lease.

The case was heard upon bill and answer; and from these it appeared, that by a sealed agreement, entered into in 1786, by Nathan Waterman, the then owner of the estate, and Archibald Stewart, the then owner of the estate adjoining it on the east, since called the Museum estate, a twenty foot gangway, running from Westminster Street to the channel of the Cove, was laid out between the two estates; thirteen feet of the width of which was taken from the land of Waterman, and seven feet from the land of Stewart; and that by said covenant it was agreed, that the gangway should remain "free and open, for the common use and benefit of them (the parties) and each of them, their respective heirs and assigns forever; and also for the equal and common use of Elisha Waterman, Rufus Waterman, and Richard Waterman, brothers of the said Nathan Waterman, their respective heirs and assigns forever;" the said brothers Waterman then owning a large real estate in that vicinity; that though the above agreement was not recorded until November 1, 1853, the gangway was actually laid out at or about the time of its date, and has been kept open ever since, though now but little used, and of no value, as a gangway, having become a nuisance to the neighborhood, from the accumulation of filth in it. Upon the death of Nathan Waterman in 1832, intestate and without issue, and the division of his estate amongst his said brothers and heirs at law, his Howard Block estate became vested in his brother, Richard Waterman, who, on the first day of January, 1847, leased the same for the term of ninety-five years to the respondent. This

lease, which was by indenture, and executed by both parties, witnessed : " That the said Richard Waterman, for and in consideration of the rents and covenants hereinafter named and contained, on the part of the said George A. Howard, his executors, administrators, or assigns, to be paid, kept, and performed, hath demised, leased, and to farm let, and by these presents doth demise, lease, and to farm let, unto him the said George A. Howard, his executors, administrators, and assigns, a lot of land, situate on the northerly side of Westminster Street, on the west side of the bridge in said city of Providence, and bounded, southerly, on said Westminster Street, sixty-four feet and six inches ; westerly, on a gangway eleven feet in width, and extending on said gangway from said Westminster Street, about two hundred feet to Fulton Street ; northerly, on said street about sixty-four feet and six inches ; and, easterly, on a gangway about two hundred feet ; *the said gangways are to be kept open for the benefit of the lot hereby leased, and also of the lots hereunto adjoining ;* together with two shares, or rights, in the Rawson Fountain Society ; the lot hereby leased is the lot next west of the ' Stewart Gangway,' so called. To have and to hold," &c. The lease then went on to provide, by express mutual covenants, for an appraisement of the rent at the end of fifteen years, and at the end of every five years thereafter during the term ; for the payment of taxes and assessments by the tenant ; that the buildings and improvements put and being upon the premises should be pledged as security for the annual rent ; that in case of rent in arrear six months, and after demand thereof, the lessor, his heirs and assigns should have the right to reënter and terminate the lease, in which case, as well as at the end of the term by lapse of time, the buildings and improvements then upon the premises should be conveyed to, and purchased by the lessor, his heirs and assigns, at their appraised value ; and the lease concluded with an express covenant on the part of the lessee to pay rents and taxes, and at the termination of the lease peaceably to surrender possession of the demised premises. Upon the death of Richard Waterman, shortly after the above lease was entered into, his two sons, Stephen and Caleb, and the children of a deceased son, Nathan,

as representatives of their father, took, by devise, his real property, including the Howard Block estate, as tenants in common; and upon a probate division of the same amongst them, made in 1848, the reversion of the Howard Block estate became vested in Stephen and Caleb. The petition for the division, signed by all interested, described this estate as " one lot of land, in the said city of Providence, on the north side of Westminster Street, adjoining the same, and measuring sixty-four feet and one half foot on said street, and running back two hundred feet to Fulton Street, and leased to George A. Howard, *with right in the gangways adjoining.*" By mesne conveyances from the devisees and representatives of the devisees of Richard Waterman, the complainant was, at the filing of the bill, the owner of one fifth, and the respondent, of four fifths, of the reversion of the Howard Block estate, to come into possession of the former upon the determination of the above lease for ninety-five years to the latter. The deeds of this reversion, executed to the respondent, recognized the gangway on the east of the estate. The Museum, or Stewart estate, lying directly east of the gangway in question, and the right in the gangway, were purchased by the late Gamaliel L. Dwight, Esq., in April, 1851; his deeds having been recorded on the 22d day of April of that year; and was by Dwight, on the 18th day of January, 1854, conveyed for value to the respondent, by deed of that date, recorded on the 23d day of January, 1854; since which it has remained the sole property of the respondent.

The buildings on both these adjoining estates, the Waterman or Howard Block estate, leased to the respondent, and the Stewart or Museum estate, owned by him, having, in November, 1858, been destroyed by fire, the respondent proposed to build a continuous building, covering the front of both estates on Westminster Street, and thus to close up the twenty foot gangway, laid out and existing as aforesaid between them. It was to enjoin this closing up of the gangway by the respondent, as contrary to the stipulation of his lease of the former estate, that this bill was filed by the complainant as entitled to one fifth of the reversion thereof.

*T. A. Jenckes,* for the complainant, contended, that the agree-

ment of 1786, laying out the gangway, if known to the respondent, was binding upon him, though not recorded until after his lease, and after the conveyance of the Stewart or Museum estate to his grantor, Dwight, or by Dwight to him. The open gangway was notice sufficient to him ; and if not, his title-deeds, as reversioner of four fifths of the Waterman or Howard Block estate, as well as his title-deeds, as owner of the Stewart or Museum estate, bounded him upon, and apprised him of, the gangway, and the right to the gangway.

He also insisted, that his lease of the Howard Block estate expressly required him to keep open the gangway for the benefit, not only of the lot demised, but of the adjoining lots ; that it was of no consequence why the gangway was required to be kept open, if the lease did require it. He suggested, however, that upon determination of the lease by reëntry for non-payment of rent, or upon its expiration, the lessor and his heirs and assigns were bound to purchase the buildings at an appraisal, and were therefore interested in having them built according to the requirements of the lease, with all the means of access preserved which the lease stipulated for ; and that upon partition of the estate, especially, the gangway might be of the last importance to one or more of the part-owners, for the purpose of access to his or their part.

*James Tillinghast,* with whom was *Bradley,* for the respondent :—

The lease contains no covenant on the part of the lessee to keep open the gangways ; no reservation of them by the lessor ; the words referred to as such, being mere words descriptive of their character as existing for the benefit of the leased and the adjoining estates, and implying a stipulation on the part of the lessor, that he would not, during the term, close them up. The express mutual covenants which follow, in the lease, and the express covenant of the lessor, with which it closes, support this construction.

By the terms of the lease, the gangways are to be kept open for the benefit of the lot leased, and of the lots adjoining thereto ; meaning, that they are to be kept open,—the gangway, twenty feet wide, on the east of the Howard Block lot, for the benefit

1 *

of that lot and the Stewart or Museum lot, and the gangway eleven feet wide, on the west of the Howard Block lot, for the benefit of that lot and the lot west of it. As owner of the Stewart or Museum lot, and as lessee for ninety-five years of the Howard Block lot, the respondent is alone interested in that gangway, and may, therefore, close it up.

As to the agreement of 1786, no claim is set up in the bill, except under Nathan Waterman and Richard Waterman; and as that agreement was not recorded until after the lease and after the deed of the Stewart estate to Dwight, the grantor of that estate to the respondent, the agreement cannot bind the latter.

The gangway is not only useless, but a nuisance; and a court of equity will not, on account of a stipulation in a lease made for the benefit of two estates, of one of which the defendant is the absolute owner, and of the other of which he is the lessee for ninety-five years, enjoin him from a valuable improvement, which can possibly harm no one. If the closing of this gangway by buildings affects the property injuriously, the lessor will be compensated in their lesser value upon appraisal, at the determination of the lease. The injury, at all events, may be compensated in money, and a court of equity will not, in such a case, enjoin; or where the injury is not in the nature of irreparable mischief, or, at least, a serious injury. *Collins* v. *Plumb*, 16 Ves. 454; *Atkins* v. *Chilson*, 7 Met. 398; *Dana* v. *Valentine*, 5 Ib. 8, and cases cited; *Ingraham* v. *Dunnell*, Ib. 118. In *Dickenson* v. *Grand Junction Canal Co.* 19 Eng. L. & Eq. R. 292, and in *Steward* v. *Winters*, 4 Sandf. Ch. R. 587, the injury was, in fact, serious. In short, the court exercises, in such cases, an equitable discretion; and will refuse to enjoin, or dissolve an injunction granted, upon the ground that the complainant has acquiesced in what he complains of. *Wood* v. *Sutcliffe*, 8 Eng. L. & Eq. R. 217; *Barret* v. *Blagrave*, 5 Ves. 555; S. C. 6 Ib. 103.

By the opening of Dorrance Street, at the west end of the leased premises, affording a fine access to it, not contemplated at the time the lease was given, things have so changed, that the court should act upon the presumption, that had the change

in question been anticipated, the clause in question would have been modified, or would not have been inserted.

If the court feel bound to enjoin at all, they will, at least, define what is a " keeping open " of this gangway for the benefit of this and the adjoining estates ; and say, whether the respondent may not be permitted to arch it over with his building, with flights of steps from its sides to the story above, leaving a sufficient space for passage, and providing for light.

AMES, C. J.　This is a bill, filed to enjoin a tenant from building upon and closing up a gangway, part of the demised premises, or, in which he has a right as appurtenant to them, as an act forbidden by a stipulation in his lease ; and is in the nature of a bill for the specific performance of a contract.　*Barrett* v. *Blagrave,* 5 Ves. 555.

The lease is by indenture, purporting to be the deed of, and actually executed by, both parties ; and, after describing the lot leased as bounded on the west, by a gangway eleven feet wide, and on the east, by the gangway in question, there is thrown in, at the end of the description, this sentence : " *the said gangways are to be kept open, for the benefit of the lot hereby leased, and also of the lots hereunto adjoining ;* " after which the description of what is demised proceeds, " *together with two rights or shares in the Rawson Fountain Society ; the lot hereby leased is the lot next west of the ' Stewart Gangway,' so called,*" another reference to this gangway.　Now it is said, that, in this, there is no covenant on the part of the lessee to keep the gangways open, or reservation of the right to have them kept open on the part of the lessor, but a simple description of the lot as bounded by gangways, and, the language being wholly that of the lessor, a stipulation on *his* part that he will not close them.　We cannot agree to this construction as the natural one, or that accordant with the probable intent of the parties.　The gangways were, in fact, laid out for the benefit of the adjoining estates as well as of the estate leased ; and this gangway, the lease says, was called " the *Stewart* gangway," after, it would seem, the estate adjoining it on the east, the uses of which it served, equally with those of the lot demised.　In the midst of the description of what was leased, we find this positive declara-

tion, looking to the future, inserted, as a clause by itself: "the said gangways are *to be* kept open for the benefit of the lot hereby leased, and also of the lots adjoining." As the lessor was about to part with his estate for a long term to the lessee, and, in respect to these gangways, was under an obligation, to adjoining proprietors, to keep them open, the most natural construction would seem to be, that it was his purpose to impose this obligation upon the lessee as well as to recognize it as his own. At the time of the execution of this lease, the Stewart estate was in a separate ownership and occupation; and Dorrance Street not having been laid out, this wide gangway afforded the only convenient access to the east side and rear of the demised premises. There was nothing, then, in the circumstances which would lead us to suppose, that, for the benefit of the lot leased to him, as well as in fulfilment of what was due to adjoining proprietors, the lessee should demur to enter into this stipulation as his own; and we deem this clause to have been designed to be obligatory upon both parties, and that consequently it is to be construed as the language of both. "And the words of an indenture are the words of either. party. And albeit they be spoken as the words of the one party only, yet they are not his words alone, but may be applied to the other party if they doe more properly belong to him; for every word that is doubtful shall be applied and expounded to be spoken by him to whom they will best agree according to the intent of the parties; and they shall not be taken most strongly against one, or beneficially for the other, as the words of a deed-poll shall." Sheppard's Touchstone, 52.

But it is argued, that granting this to be the covenant of the defendant, it is so qualified that it cannot be the basis of an injunction; and the case of *Collins* v. *Plumb*, 16 Ves. 454, is cited as a parallel case. That was the case of a covenant annexed to the grant of a well, "not to sell or dispose of water, to any person or persons whomsoever, to the injury of the proprietors of certain waterworks, their heirs, executors, administrators, or assigns," who were the grantors of the well. Lord Eldon would not enjoin the breach of this covenant, because the injunction would be of no value to the plaintiffs, since, upon

every application to commit for a breach of it a trial must be directed to ascertain whether a particular act of sale, which the covenant implied might be without injury to the plaintiffs, would in fact be injurious to them ; the purpose of an injunction being to save further litigation.   But we cannot see how the positive affirmation of the covenant in the case before us, that, " the said gangways are to be kept open," is qualified by the statement of the purpose of keeping them open ; to wit, " for the benefit of the lot hereby leased, and also of the lots hereunto adjoining." Such an avowal of the purpose of a positive covenant constitutes the purpose neither a condition nor limitation of the covenant ; but simply declares the motive or inducement of the parties to enter into it.   The motive may have been a wise or foolish one,—it may exist or have ceased to exist,—yet the covenant, if it be lawful, remain unaffected. To assimilate this covenant to that in *Collins* v. *Plumb*, we must construe it to be limited by the fact of benefit, as that was limited by the fact of injury.   We must confound an inducement to enter into an agreement with a plain qualification of its terms ; the keeping open of a gangway, which implies continuity, with the selling of water, which supposes many distinct acts, each, according to its character, having a different effect.

Taking this covenant, then, to keep the gangways open, to be the unqualified covenant of the defendant, the court is asked by this bill to restrain him from closing one of them up by his projected building, and, by such restraint, to compel him, literally, to perform his covenant.

The principles which regulate the exercise of the jurisdiction in this and the like cases are explained by Lord Cottingham, in *Dietrichsen* v. *Cabburn*, 2 Phillips, 52, S. C. 2 Cooper, time of Cottenham, 72, and illustrated by numerous authorities.   The jurisdiction to restrain by injunction an act from which the defendant, by contract or duty, is bound to abstain, is not confined to cases in which the court has jurisdiction over the acts of the plaintiff.   If the bill state a right or title in the plaintiff to the benefit of the negative agreement of the defendant, or to his abstaining from the contemplated act, it is not material whether

the right be at law, or under an agreement which cannot be otherwise brought within the jurisdiction of the court. As in patents, copyrights, services to mills, and the like, the complainant may demand the interposition of the court for the protection of his ascertained legal right. Ib.

The right of the plaintiff, as joint owner with the respondent of the reversion of the demised premises, to insist, that the latter shall not, in the use of them as lessee, violate an express stipulation of the lease, is clear ; for although the tenant has become the owner of four fifths of the reversion, he is estopped by the lease, under which he was let into and now holds possession, from denying the title of his landlord, so far as represented by the plaintiff, or from claiming, as to him, any rights in the thing demised at war with the provisions of his lease. As long as his title to possess the whole premises embraced in the original contract of letting rests upon that contract, his relation and obligations as tenant are to be judged and measured by it, and remain in full force, notwithstanding his interest in the reversion.

The act or obstruction of right threatened, being, too, of a permanent or continuing character, the case would seem to be, so far as that goes, a very fit one for the action of the court. Indeed, upon principle, the strongest case for the interposition of the court to prevent a clear breach of contract as to the use of property, is one, in which the owner, as landlord, licensor, principal, or client, had entrusted the respondent, as his tenant, licensee, agent, or attorney, with the custody of, or power over it, by the very contract attempted to be violated. These are fiduciary relations, so far as the subject of them is concerned ; and, in a court of equity, the strictest good faith in the observance of the duties required by them is properly compelled. *Dietrichsen* v. *Cabburn, Barret* v. *Blagrave,* supra ; *Lord Grey De Wilton* v. *Saxon,* 6 Ves. 106 ; *Cholmondeley* v. *Clinton,* 19 Ib. 261 ; *Macker* v. *The Foundling Hospital,* 1 V. & B. 188 ; *Rankin* v. *Huskisson,* 4 Sim. 13 ; S. C. 6 Eng. Cond. Ch. R. 14 ; *Squire* v. *Campbell,* 1 M. & C. 459 ; S. C. 13 Eng. Cond. Ch. R. 468 ; *Youatt* v. *Winyard,* 1 Jac. & Walk. 394 ; *Green & others* v. *Folgham & others,* 1 Sim. & Stu. 398 ; S. C. 1 Eng. Cond. Ch. R.

398; *Morrison* v. *Moat*, 6 Eng. L. & Eq. R. 14; 9 Ib. 182; *Hills* v. *Miller*, 3 Paige, 254; *Barrow* v. *Richard*, 8 Ib. 351; *Steward* v. *Winters*, 4 Sandf. Ch. R. 587.

Two main objections are raised by the respondent to the injunction applied for in this case. The first is, that this gangway, if not laid out, was recognized by the lease as existing solely for the benefit of the Waterman or Howard Block estate, and the Stewart or Museum estate, between which estates it lies; and that, as he has become the owner in fee of the latter estate, and is the lessee for the long term of ninety-five years from the 1st day of January, 1847, of the former estate, he has, as the legal owner of both, a right to dispense with the stipulation in question, and to improve both, during his term, in the manner most advantageous to himself.

It is difficult to see how his title to the Stewart estate can enable him to dispense with a stipulation made by him as lessee of the Waterman estate; it is still more difficult to see how his title *under* the lease can enable him to close up a gangway which, for the benefit of the leased premises, as well as of the adjoining estates, he agreed, in the lease, to keep open during his whole term. The lease looks through the term, and, as between him and his landlord, restricts his rights as tenant in this very particular; and these might as well be urged as enabling him to dispense with any other stipulation of the lease as the one we are considering.

Nor can we speculate upon the question, as to the manner in which the parties, for their mutual interests, would have contracted, had they foreseen the changes which have since taken place in that neighborhood, any more, than whether they would have contracted at all; or hold, that either is discharged from the obligation of his contract in consequence of those changes. All contracts, looking through long tracts of time, are necessarily made with the knowledge that before they expire changes must occur; and so that the subject itself remains, the chances and changes of things have never been understood, either at law or equity, to dispense with, or even to modify, the construction of an express stipulation, unless provision be made in it to that effect. If the parties have agreed, that *for the benefit* of the

leased and adjoining estates, this gangway shall be kept open, we have no right, from subsequent occurrences, to be wiser than they were, or to revise their judgment, thus embodied and made binding upon all. The maxim of "*cessante ratione,*" &c., referred to at the argument, when applicable at all, is applicable to rules of law, and not to contracts. The *parties* alone are competent, by a new agreement, to accommodate an old one to new circumstances, so as better to carry out their original purpose. If the court were to do it, it would make a contract for them.

The other objection is, that inasmuch as the gangway, though hitherto kept open, is, since the opening of Dorrance Street, but little used, and is of no value,—but on the contrary, from the accumulation of filth in it has become a nuisance in the neighborhood,—a court of equity ought not, according to its rules, to interpose to prevent the respondent from reaping a great advantage from his proposed improvement of his estates by building upon and closing it up, his agreement notwithstanding, when little or no harm can come to the plaintiff from so doing.

We do not feel at liberty, when properly invoked to prevent the violation of such a covenant, to grant or refuse our interposition according to the comparative advantages which may accrue to the one party, or evils which may fall upon the other, from such violation. The contract concludes, and shuts out, all such considerations. The proprietor of an estate has a right to dictate, so that they be lawful, the terms upon which he will permit another to possess and enjoy it ; and it will hardly do, in a court of conscience, for the party who accedes to them, and is thus, as tenant, let in to the property of another, to urge the convenience of dispensing with them as the reason for his being permitted to do so. The greatest advantages known to the law are those which come from the observance of good faith ; the worst evils, from the want of it ; and in comparison with these, as in honor and in morals, all others fade into comparative insignificance.

This, as it might be supposed, is the settled doctrine of a court of equity in relation to the exercise of its injunctive process to prevent the violation of such a covenant in a lease, or a breach

of contract, or abuse of confidence or trust, in analogous cases. The nature and degree of the mischief,—the comparative advantage of its interference to the plaintiff and disadvantage to the defendant,—is regarded by the court as a reason for its action or inaction only in relation to torts; and then, except in cases of fugitive trespass only, upon a motion for a preliminary injunction, pending the controversy concerning the right. *Sprague* v. *Rhodes*, 4 R. I. Rep. 302. It is true, as shown by the cases of *Barret* v. *Blagrave*, 5 Ves. 556, and *Wood* v. *Sutcliffe*, 8 Eng L. & Eq. R. 217, S. C. 2 Simon, N. S. 163, quoted for the respondent, and as might be shown by numerous others, if the plaintiff, by acquiescence in a tort, has invited the defendant to outlay upon the faith of such acquiescence, or has by such conduct equitably waived the benefit of a contract to which he was entitled, he is as entirely debarred from receiving the aid of the court for his protection, as if he had released either under his hand and seal. In this case there has been, however, not only no such acquiescence, but no acquiescence whatever. The gangway is still open; and the plaintiff has applied, upon the mere threat of the defendant to close it up, indicated by the plan of his projected building, and his preparations for the foundation of the same. But the case of *Wood* v. *Sutcliffe*, supra, which was a bill to restrain the pollution of the mill-stream of the plaintiffs, is no authority for the position of the defendant, that upon the *final hearing* of a bill for protection against a continuing tort, a court of equity will refuse to enjoin it, merely because the mischief done or threatened is inconsiderable. That case was heard upon a motion for a preliminary injunction; and the remark of the vice-chancellor, in reply, that the mischief complained of was such as could be properly and adequately compensated by pecuniary damages, was based upon a fact which appeared upon the motion, that the plaintiffs had entered into an arrangement with other mill-owners, by which they were permitted to pollute the water of the stream at the rate of 2*l.* per horse-power of their steam-engines. "On the ground, therefore," says the vice-chancellor, Sir R. Kindersley, "that the plaintiffs themselves have shown that the injury they complain of is one which, in some

way, may be compensated by money, I think that I ought not to grant the injunction." S. C. 2 Sim. N. S. 169. The motion was in truth denied, so far as this ground went, because it appeared to have been made, merely "to apply to the defendants a certain pressure to bring them to terms also;" and because the vice-chancellor thought, as he said, that he "ought to leave the plaintiffs to that pressure which may be applied by means of an action or actions at law." Ib. In *Rochdale Canal Co.* v. *King*, 2 Sim. N. S. 78, the same vice-chancellor said, that but for the acquiescence of the plaintiffs, he would have enjoined the defendant before the final hearing, from using the water of their canal for purposes not warranted by law, upon the mere legal right, although they had recovered, in an action at law against the defendant for such unlawful use, only one shilling damages.

If the case of *Atkins* v. *Chilson*, 7 Met. 398, on this point mainly relied upon at the argument by the respondent, be understood to confound all distinctions between cases of tort and contract, and in the former class of cases, to limit relief to those cases only in which the mischief, though continuing, is irreparable or serious, it is at war with all the authorities before us, and numerous others. To examine a few.

In *Lord De Grey Wilton* v. *Saxon*, 6 Ves. 106, which was a motion for a preliminary injunction to restrain a tenant from breaking up meadow for the purpose of building, contrary to a covenant in his lease, Lord Eldon, in granting the motion, observed, "that he did so upon the ground of the covenant not to convert meadow; otherwise, he doubted whether it would do, upon the ground of waste, without an affidavit that it was *ancient* meadow." In *Macher* v. *The Foundling Hospital*, 1 V. & B. 188, his lordship expressly disclaimed the right of a court of equity to enter into a comparison, and to hold that a tenant, if licensed by acquiescence to carry on, contrary to the covenants of his lease, one trade on the leased premises, was thereby licensed to carry on other trades, as less offensive. In *Rankin* v. *Huskisson*, 4 Sim. 13, S. C. 6 Eng. Cond. Ch. R. 14, and in *Squire* v. *Campbell*, 1 M. & C. 459, S. C. 13 Eng. Cond. Ch. R. 468, which were bills filed by tenants of public lands under building leases, to enjoin the commissioners and officers in

charge of the lands, in the one case, from building, and in the other case, from erecting a statue near the sites leased, contrary to the agreements of letting; the decision, in the one case, and the discussion in the other, show, that the question was supposed to turn wholly upon the fact of violation of contract; the court holding, in the latter case, that the statue, which was of George the Third, was no nuisance, as it did not interfere with the carriage-way. In *Dickenson* v. *Grand Junction Canal Co.* 15 Beav. 260; S. C. 19 Eng. L. & Eq. R. 287, 293; in which it appeared, that a contract had been entered into between a canal company and mill-owners, sanctioned by an act of parliament, 58 Geo. 3, ch. 16, regulating the mode of using certain waters by which both were supplied, and that the company had used the waters in violation of the contract, they were, upon final hearing, perpetually enjoined from so using them. In delivering his judgment, the Master of the Rolls said : " If it be a contract duly entered into between the parties, it is no answer to a violation of it, to say, that it will not inflict injury upon one of the contracting parties. If the plaintiff have purchased from the company a right to preserve the waters of the rivers Bulbourue and Gade from being diverted in any other manner than as diverted at the passing of 58 Geo. 3, it is no answer to them to say, *that the diversion proved will not be injurious to them, or even to prove that it may be beneficial to them.* It is for them to judge whether the agreement shall be preserved, so far as they are concerned, in its integrity, or whether they shall permit it to be violated. It is, therefore, in my opinion, a matter of no moment in this case, that the plaintiffs have given no evidence of any actual diminution of water at their mills. Having established that the acts of the defendants are a violation of the contract entered into between them and the plaintiffs, and a violation of the act of parliament passed to carry it into effect, the plaintiffs are entitled to call upon this court to protect them in the enjoyment of that right which they have so purchased; and this court is bound to preserve it from being broken in upon." In *Steward* v. *Winters,* 4 Sandf. Ch. R. 587, a preliminary injunction had been granted to restrain the defendant from using as an auction-room, a store leased to him, " to be

occupied for the regular dry goods jobbing business, *and for no other kind of business.*"   Upon a motion to dissolve the injunction, because no irreparable or any injury, from the violation of the terms of the letting, had been proved, the vice-chancellor denied the motion, distinguishing the case from the case of a nuisance, "the owner or lessor having a right to insist upon such covenants as he pleases, touching the use and mode of enjoyment of the land."   "He has a right, says he, to define the injury for himself; and the party contracting with him must abide by the definition."

The fact averred in the answer, that this gangway, from the filth accumulated in it, has become a nuisance in that neighborhood, does not help the defendant, or afford us a cause for permitting him to close it up.   As he was in possession of the estates on both sides of it, it was his duty to keep it clean, or at least from becoming a public nuisance; and his neglect of so obvious a duty certainly does not entitle him to break his contract to keep it open.   The abatement of such a nuisance may properly be left to the public authorities; and will consist, not in closing the gangway, but in compelling the defendant to keep it clean enough to preserve health, and to prevent noisome smells in the neighborhood.

We are asked by the respondent, even if we enjoin him, to determine what the keeping open of the gangway, in the sense of this stipulation in his lease, is; and, at least, so to modify our injunction as to permit him to overarch it with his building, and encumber its sides with flights of steps leading into the second story of his building; he taking care to provide it with sufficient light for the purpose of convenient passage through it. The phrase in the covenant, "the said gangways are to be *kept* open," necessarily refers to the manner and degree in which they were kept open at the time of the covenant.   We understand by them that, in this respect, that state of things, which for the benefit of the estate of the lessor and in fulfilment of his obligations to the proprietors of adjacent estates had so long existed as the measure of the rights of all, is to continue during the term of the lease; and our injunction must be to that effect.

In conclusion, it is highly probable that it will be greatly

advantageous to the defendant, and but little injurious to the plaintiff, that the new block projected by the former should extend continuously along the Westminster front of his leasehold and freehold estates, and thus close up this gangway. It is, however, the plaintiff's right and the defendant's covenant that it should be kept open; and although it may seem to us a fit case for an arrangement, we are compelled, both by principle and authority, upon the demand of the plaintiff, to protect him in what is thus secured by law.

Let a decree be entered perpetually enjoining the defendant from building upon or over, closing up, or otherwise obstructing passage into, through, or along the gangway in the pleadings mentioned.